# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Newport News Division

JUSTIN SIMONS, *on behalf*
*of himself and all other similarly situated,*

        Plaintiff,

v.                                    Civil Action No. _____

TRANS UNION, LLC,

        Defendant.

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, JUSTIN SIMONS (hereafter "Plaintiff"), by Counsel, on behalf of himself and all similarly situated individuals, and for his Class Action Complaint against Defendant TRANS UNION, LLC, alleges as follows:

## PRELIMINARY STATEMENT

1.    This is a consumer class action brought for willful violations of the Virginia Consumer Protection Act, VA. CODE ANN. §§ 59.1-196–207 ("VCPA") and Fraud against Defendant Trans Union, LLC, which uses its industry position as one of the "Big 3" credit reporting agencies to market a meaningless and fraudulent product – its idiosyncratic "Vantage Score" to consumers who believe they are purchasing an actual FICO credit score and do not learn otherwise until their purchase is complete.

2.    Plaintiff alleges class claims against Trans Union pursuant to § 59.1-200A(1),(2),(3) of the VCPA as to his and the putative Class Members for its: (1) misrepresenting goods or services; (2) misrepresenting the source, sponsorship, approval, or certification of goods or services; and (3) misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services with another.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this matter based upon 28 U.S.C. § 1332(d).

4. Trans Union is not a resident of or domiciled in the Commonwealth of Virginia.

5. Discovery will show that over 10,000 Virginians purchased the Trans Union Vantage Score during the class period and suffered a willful violation of the VCPA.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

7. Plaintiff is a natural person and a consumer protected by the VCPA.

8. Defendant is a "person" and "consumer reporting agency" as defined by 15 U.S.C. § 1681a(b) and 15 U.S.C. § 1681a(f), respectively. Defendant is a foreign limited liability company and none of its managers are located or domiciled in Virginia.

9. At all times relevant to this Complaint, Trans Union was in the business of providing goods and services to consumers, and Plaintiff's purchase from Trans Union was for his personal use. Trans Union was a "supplier" governed by the VCPA.

## FACTUAL ALLEGATIONS

10. Defendant is one of the "big three" credit reporting agencies ("CRA") in the United States.

11. Defendant sells consumer reports and credit scores about millions of consumer annually, including consumers in Virginia.

12. Trans Union casts itself as a neutral summary of credit information systematically reported by creditors and other subscribers. But in truth, the Defendant is itself the gatekeeper, arbitor and producer of consumer credit reports. It designed the credit reporting system, taught its

many subscribers – banks, credit card companies, debt collectors – how to use it, and then advertises to consumers that it can provide – for a fee – solutions to address credit inaccuracies and damage that Defendant itself may have caused.

13. Trans Union sells its "direct to consumer" products such as its "monthly memberships," for-charge reports and its faux "credit scores" as a supposed means to help the consumer solve the problem of inaccurate credit reporting. This is of course Defendant creating a problem and then marketing an antidote for the damage it causes.

14. Trans Union makes a strong profit selling personal information about consumers either to credit grantors or for marketing purposes. In the Fourth Quarter of 2020, for example, Trans Union made roughly $238 million selling product to financial services industry customers.

15. But remarkably, in that same period, Trans Union's direct-to-consumer business generated over $126 million. One third of Trans Union's domestic financial services related income came from consumers worried about what Trans Union was selling about them in its credit reports.

16. One of those false elixirs is Trans Union's "Vantage Score", a failed score product created and owned by Trans Union and its industry allies, Equifax and Experian, as a way to negotiate and lever better licensing terms from the actual credit scoring company, Fair Issacs, known as FICO.

17. In fact, Vantage Score is not a publicly recognized credit score. Very few institutional creditors use it. And it was not developed in the manner that the actual score – FICO – was developed.

18. Trans Union is well aware of this fact. Defendant offers for sale to its business customers both the Vantage Score product and, by license, the FICO Score model. Despite pushing the former, nearly all of Trans Union's credit-grantor customers purchase only on the FICO Score.

19. Trans Union knows that its scoring model is not the same as the FICO model used by actual creditors. And yet, it advertises its Vantage Score product otherwise. In its direct representations, Trans Union represents that it is actually selling a "credit score."

20. While Vantage Score may be a score that is about credit, it is not an actual "Credit Score." The Consumer Financial Protection Bureau ("CFPB") explained that "companies use credit scores to make decisions such as whether to offer you a mortgage, credit card, auto loan, or other credit product. They are also used to determine the interest rate you receive on a loan or credit card, and the credit limit."

21. In contrast, Vantage Score – sold by Trans Union – is at best an "educational score." The CFPB warned, "Some credit score sources provide an "educational" credit score, instead of a score that a lender would use. The CFPB published a report on the differences between educational scores and those used by lenders. For most people, an educational score will be close to the scores lenders use and can be helpful for consumers. But the scores can be quite different for some. Our report found a meaningful difference for one out of four people. When choosing where to get your credit score, find out what kind of score it is."

22. These misrepresentations were material in that the actual credit score Trans Union provided to a third party was substantially lower than the credit score Trans Union provided to the Plaintiff on the same day.

23. By representing one credit score to Plaintiff and a different credit score to a third party after Plaintiff purchased his credit score through the Defendant, Defendant engaged in a deceptive practice.

24. Trans Union is aware that credit scores play a vital role in the consumer market, as they are used in decisions to grant credit, set interest rates, and impose upon consumers other terms attendant to credit-based transactions.

25. Trans Union is likewise aware the consumers rely on it to provide accurate credit scores, taking into account all of the information in consumers' credit histories, and that consumers obtain credit scores in advance of significant credit transactions to best arm themselves to negotiate favorable credit terms.

26. Trans Union has also been on notice of these issues throughout the pendency of the multiple actions brought against it over the last six years.

27. Trans Union has been sued on multiple occasions upon the same allegation stated herein - that it failed to meaningfully disclose the limited value and use of the Vantage score product and intended to mislead consumers into believing it was comparable to an actual credit score.

28. In fact, in 2017, the CFPB prosecuted a fraud case against Trans Union in the same claim and issues alleged herein. The CFPB "took action against … TransUnion …for deceiving consumers about the usefulness and actual cost of credit scores [it] sold to consumers. The companies also lured consumers into costly recurring payments for credit-related products with false promises." As a result, "The CFPB ordered TransUnion … to truthfully represent the value of the credit scores they provide and the cost of obtaining those credit scores and other services."

29. Despite such admonitions and the order imposed, Trans Union did not materially change its conduct such as to truthfully and honestly represent the value – or limits on value – of its Vantage score product.

30. As a result of Trans Union's conduct, Plaintiff and the putative class members suffered particularized and concrete injuries, including damages to their reputations, reductions to their credit scores and increased risks that they would be denied credit.

31. In 2019, the Plaintiff was interested in purchasing a new vehicle and wanted to determine whether his credit would allow him to finance that purchase on terms he could afford.

32. On August 4, 2019, Plaintiff sought to review his credit report through the Defendant's annualcreditreport.com. While on that site, he was taken to Trans Union's website and offered the opportunity to purchase what he was told would be his "credit score."

33. The Plaintiff made that purchase and paid for the Vantage score product. His supposed credit score reported to him by Trans Union was 662. At the bottom of the credit score disclosure provided by Trans Union under the heading "About your TransUnion Credit Score" it indicated "Remember, we constantly update the information contained in credit report, so your TransUnion Credit Score only represents the score **a lender would receive if they requested it today.**"

34. On the same day, August 4, 2019, Plaintiff, relying upon the information that he just received from Trans Union, including its promise that a potential lender would receive the same credit score today as the one he had just purchased on the Trans Union website, applied for credit to purchase a vehicle at Checkered Flag Motor Car.

35. When Trans Union received Checkered Flag Motor Car's request for a consumer report related to the Plaintiff, Trans Union responded and transmitted a traditional credit report and a FICO credit score.

36. Plaintiff's credit score provided by Trans Union to Checker Flag Motor Car was 629, more than 30 points lower than Trans Union had represented to Plaintiff hours earlier.

37. It is commonly accepted within the financial industry, and communicated by Trans Union to the Plaintiff, that a score between 660 and 720 is considered to be a "C" level of credit, but that a credit score between 600 and 660 is considered a "D" level of credit.

38. Therefore, when Trans Union told Plaintiff that his score was 662, Trans Union communicated to Plaintiff that he had a "Tier C" credit rating, characterized as Trans Union as "average," when actually his credit score as sold to a real life subscriber (who also paid Trans Union for a score based on the exact same credit profile) was 629, or "Tier D" credit.

39. The subscriber would, obviously, prefer the lower score since it permits the subscriber to negotiate credit terms that are more favorable, and therefore more profitable, than if the consumer has a higher score.

40. Because Plaintiff's credit score was so much lower than anticipated, Plaintiff was forced to either accept a much higher interest rate than what was relayed to him that he could obtain if his credit score was indeed 662, or, in the alternative, he would need to find someone willing to co-sign for him on the loan.

41. Ultimately, Plaintiff was forced to obtain a co-borrower for the loan in order to stay within the monthly payment that he could afford, and in doing so, had to explain to the co-borrower that his credit score was within "Tier D" – lower than he was lead by Trans Union to

believe. Plaintiff suffered humiliation and harm because of the inaccurate information provided to him by Trans Union.

42. At all times pertinent hereto, Defendant was acting by and through its agents, servants and or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

43. Discovery will show that Trans Union's reporting of one credit score to the consumer and a different, and much lower, credit score to a third party on the exact same date is of no economic value to its creditor customers.

44. Even if Trans Union had sold a lower credit score to the Plaintiff than the real score that it would sell to its subscribers on the same day, Plaintiff would still have suffered injury, and other forms of injury, including being deterred in applying for credit products that he was otherwise qualified for.

45. The CFPB has studied and concluded that there was such a harm for class and subclass members, explaining:

> A consumer can face harms if, after purchasing a credit score, the consumer has a different impression of his or her creditworthiness than a lender would. If the score leads the consumer to overestimate lenders' likely assessment of his or her creditworthiness, the consumer might be likely to apply for credit lines that would not be approved, with a cost of wasted time and effort on both the consumer's and lender's part. Alternatively, the consumer may reject offers of credit that would be beneficial because the consumer's misperception of his or her creditworthiness leads the consumer to believe that the offers are over-priced. If a consumer underestimates lenders' likely assessment of his or her creditworthiness, the consumer might fail to apply for credit at all or delay applying for credit, forgoing the opportunity to buy a house or car, for example, or delaying a valuable mortgage refinancing. A consumer might also apply to lenders who offer less favorable terms than he or she might qualify for, or accept less favorable offers received through the mail or online direct marketing. In this case, the cost to the affected consumer would be higher interest costs and possibly higher likelihoods of default due to the greater costs and difficulty of making monthly payments. Lenders might benefit by being able to charge higher interest to consumers who "incorrectly" understand their options when applying; at the same time lenders would lose out on business from consumers who decide not to apply for credit due to a misperception of its likely cost. Finally, consumers who believe

their credit score to be low may take costly steps that they believe may improve their credit score.

46. Additionally, Trans Union made a conscious decision not to disclose to consumers that – even on the same day – the credit score number that the consumer had just paid for would not be the same score that it reported to one of its subscribers, or to anyone at all.

47. At all times pertinent hereto, Defendant's conduct was a result of its deliberate policies and practices, was willful, was intentionally accomplished through intended procedures and was carried out with reckless disregard of its obligations.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following class:

> All natural persons who within the two years preceding the filing of this action and through the date of class certification, and when Trans Union's files showed them to have a Virginia primary address paid for and obtained a Vantage score product from Trans Union.

49. Plaintiff also brings claims on behalf of the following Subclass:

> All individuals who are members of the Class and who at the time they obtained their Vantage Score from Trans Union, their FICO score would have varied by at least 30 points.

50. **Numerosity. FED. R. CIV. P. 23(A)(1).** The Class and Subclass members are so numerous that joinder of all is impractical. Upon information and belief Defendant sells hundreds of thousands of Vantage scores each year, with tens of thousands in Virginia, and at least 10,000 in the Subclass. Those persons' names and addresses are identifiable through documents maintained by Defendant.

51. **Existence and Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(A)(2).** Common questions of law and fact exist as to all members of the Class and

Subclass, and predominate over the questions affecting only individual members. The common legal and factual questions include, among others, whether Defendant violated the VCPA and whether that violation was willful.

52. **Typicality. FED. R. CIV. P. 23(A)(3).** Plaintiff's claims are typical of the claims of each Class member. Plaintiff has the same claims for statutory and treble damages as Class members, arising out of Defendant's common course of conduct.

53. **Adequacy. FED. R. CIV. P. 23(A)(4).** Plaintiff is an adequate representative of the class. His interests are aligned with and are not antagonistic to, the interests of the members of the Class he seeks to represent, he has retained counsel competent and experienced in such litigation, and he intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of members of the class.

54. **Predominance and Superiority. FED. R. CIV. P. 23(B)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and treble damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the class individually to redress effectively the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expenses to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action devise will result in substantial benefits to the litigations and the Court by allowing

the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

55. Class certification is appropriate because Defendant has acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Subclass members. Fed. R. Civ. P. 23(b)(2).

**COUNT ONE:**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(VA. CODE ANN. § 59.1-196, *et seq*.)**
**(Class Claim)**

56. Defendant entered into a consumer transaction as defined in Va. Code § 59.1-198 with Plaintiff and each putative Class Member.

57. Defendant was a supplier of consumer goods and services as defined in Va. Code § 59.1-198 as to Plaintiff and each putative Class Member.

58. In the course of Defendant's business, it willfully failed to disclose the nature of its Vantage score product and successfully designed and implemented its marketing and advertising to mislead consumers to believe that its Vantage score was an actual credit score and one with reliable predictive value for determining the score a lender would receive and use.

59. Accordingly, Trans Union engaged in acts and practices violating the VCPA.

60. Defendant violated the VCPA as to Plaintiff and member of the putative Subclass in multiple ways, including by example only and without limitation: (1) misrepresenting goods or services; (2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (3); misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (4) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; (5) misrepresenting the affiliation, connection, or

11

association of the supplier, or of the goods or services; and (6) using other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. VA. CODE ANN. § 59.1-200.A.

62. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

62. Defendant's conduct proximately caused injuries to Plaintiff and the other Class Members.

63. Plaintiff and each putative Class member would have necessarily relied upon such misrepresentations and omissions.

64. Plaintiff and the other Class Members were injured as a result of Defendant's conduct and each consumer suffered an actual loss. Such injury included, by example only and without limitation, the cost of the faux report, the time and resources invested to seek, pay for, and review the faux score.

65. Trans Union further violated the VCPA in that its conduct was carried out with reckless disregard and intent, and were thus willful, rendering Trans Union liable pursuant to § 59.1-204(a), entitling each Class member to $1,000 in statutory damages.

66. In the alternative to the allegation that Defendant's violations were willful, Trans Union is liable pursuant to § 59.1-204(a), entitling each Class member to $500 in statutory damages.

67. Plaintiff and the putative Class Members are also entitled to equitable relief pursuant to Va. Code § 59.1-203(C) to restrain further violations of the VCPA, and pursuant to Va. Code § 59.1-205 to devest and refund all monies collected.

68. Plaintiff and the putative Class Members are entitled to recovery costs, and attorneys' fees from the Defendant in an amount to be determined by the Court.

## COUNT TWO – FRAUD
### (Individual Claim)

69. The above-alleged misrepresentations and omissions also constituted fraud by Trans Union against the Plaintiff.

70. Plaintiff reasonably relied upon the Defendants' misrepresentations and material omissions.

71. Trans Union made the misrepresentations and omissions with the intent to mislead. him.

72. Defendant's misrepresentations and conduct were deliberately and intentionally made such to constitute both legal and actual malice.

73. Plaintiff suffered actual damages in his payment made to Trans Union, his inability to prepare for and address the credit he faced, having to pay additional amounts for the vehicle he purchased, and humiliation from his reliance on Trans Union's misrepresentations to him.

74. Plaintiff is entitled to and Trans Union is responsible to pay punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, JUSTIN SIMONS, request that the Court enter judgment on behalf of himself and the class he seeks to represent against Defendant for: (1) certification for this matter to proceed as a class action under Rule 23(b)(2) and 23(b)(3), with Plaintiff and his Counsel appointed to represent the Class; (2) for statutory and treble damages for the Plaintiff, Class and Subclass as to Count One, as pleaded herein; (3) for actual and punitive damages for the Plaintiff individually as to Count Two; (4.) for equitable relief as pled; (5.) for attorneys' litigation expenses and costs of suit; and (6) such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

                                  Respectfully submitted,
                                  JUSTIN SIMONS,

BY: */s/ Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1A
Newport News, Virginia 23601
(757) 930-3660
(757) 930-3662 fax
lenbennett@clalegal.com
craig@clalegal.com